PUMP, APPELLANT, *v.* FOX, APPELLEE.

(No. 534—Decided May 1, 1961.)

*Mr. K. J. Nordstrom* and *Mr. H. S. Lutz,* for appellant.
*Messrs. Culbert, Hyzer & Culbert,* for appellee.

FESS, J. Plaintiff appeals on questions of law from a judgment for the defendant directed by the court at the conclusion of plaintiff's case upon her first cause of action for recovery of damages for alleged malpractice by the defendant on the ground (1) that no negligence had been proven against the defendant and (2) that the action had been brought more than one year after the cause thereof accrued. (Section 2305.11, Revised Code.)

Defendant cross-appeals from a judgment in the sum of $2,193.47 entered on a verdict against defendant upon an alleged agreement by defendant to pay hospital and physicians' bills incurred in subsequent operations.

With regard to the first ground upon which the verdict was directed, suffice to say that in our opinion at the close of plaintiff's case there was adduced evidence upon which reasonable minds could differ in support of plaintiff's claim of negligence in the performance of an operation upon plaintiff.

With regard to the bar of the statute of limitations, the action was commenced on June 9, 1958. Upon this phase of the case the evidence discloses:

The defendant was the owner and operator of the Fremont Community Hospital and the Fremont Clinic located adjacent to the hospital. On April 13, 1956, the defendant performed an operation on plaintiff, consisting of a complete hysterectomy, right oophorectomy, salpingectomy and appendectomy. On April 21, 1956, bills were rendered plaintiff and her husband by the defendant for professional services (surgery) rendered April 13, 1956, in the sum of $173.50 and confinement in the Community Hospital from April 12 to 21, 1956, in the sum of $262.85. Plaintiff's admission card contains a notation ''Paid—4-21-56— $115.00.'' Presumably the balance remains unpaid.

Plaintiff testified that upon the fourth day after the operation, upon the removal of a catheter, she discovered that she

was unable to control her flow of urine and upon inquiry of Dr. Stabholz, defendant's associate, he told her "that is natural, that happens most of the time during an operation, you will be all right in a few days."

Plaintiff also testified that she heard a conversation between Dr. Stabholz and the defendant regarding her leakage and that the defendant remarked "that will happen, that is just acid in her water."

This leakage continued for the remainder of her stay in the hospital and after her return to her home. She returned for further consultation regarding her condition with Dr. Stabholz, who remarked: "I think it will clear up in a few days and if it does not then come back."

Plaintiff testified further that some time in May, on a second visit, Dr. Stabholz called in Dr. Fox, "and they had me on the table and he showed Dr. Fox the leakage and remarked 'Dr. Fox, you done the operation, now you done the damage, you take care of her.' And that is when Dr. Fox 'took over.' And Dr. Stabholz had nothing to do with me no more." "Does that mean that you visited Dr. Fox for a while then? A. Yes." Later on an unspecified date, plaintiff testifies that she went to see Dr. Fox who made a further examination of her uterus and leakage from her bladder.

Some time later, plaintiff had another consultation with Dr. Fox, who told her he had arranged consultation the following morning with a Dr. Johnson from Toledo. She returned to the defendant's office and submitted to a further examination by Drs. Johnson and Fox. On this occasion, Dr. Fox left a catheter in plaintiff, from which she suffered an infection and her husband went to see Dr. Fox, who gave him some pills for her use.

Plaintiff's post-operative condition was diagnosed as attributable to a vesicovaginal fistula.

On July 3, 1956, plaintiff and her husband drove to Toledo where she was examined by Dr. Johnson and returned to Fremont and reported to Dr. Fox that Dr. Johnson had told her that "if the bladder had not healed in that length of time with the catheter being in then it never would heal." She reported further that Dr. Johnson had recommended another operation to

be performed in Toledo since Dr. Fox did not have equipment to work with in his hospital in Fremont. She testified further that Dr. Fox said "no, you cannot go to a Toledo hospital * * * if you be operated on you have to be operated on here at my hospital * * * I will have a doctor come in here in a few days and taking over the Community Hospital and I want you to see him."

A few days later she returned and was introduced by Dr. Fox to Dr. Trivett, the former saying " 'this is Mrs. Pump, the one I want you to operate on' and Dr. Fox asked me 'would you want Dr. Trivett to operate on you, fix you up?' and I said 'I would like to be fixed up, yes.' "

As of July 31, 1956, defendant entered into a lease with option to purchase of the Fremont Clinic and Community Hospital with Dr. J. C. Trivett and as part inducement to the execution thereof defendant agreed not to enter into competition, as a general practitioner, in Sandusky County, reserving, however, the right to engage in the limited practice of eye, ear, nose and throat.

Thereafter, on September 11th, Dr. Trivett performed another operation to correct plaintiff's incontinence, for which Dr. Trivett billed plaintiff and her husband $170 for services and $480.47 for confinement in the hospital from September 10 to October 6, 1956. This operation proved unsuccessful.

She returned to Dr. Trivett and was again confined to the hospital for a period of four days and again discharged on October 26th. Her leakage continued through November, December and January, 1957. Periodic calls or visits were made to Dr. Trivett.

Eventually, Dr. Trivett recommended another operation by Dr. Maras, a specialist in Cleveland, and plaintiff again called and talked to Dr. Fox about it. She testified:

"A. * * * I went and talked to Dr. Fox and I told Dr. Fox that Dr. Trivett was talking about Dr. Maras of Cleveland. And at this time Dr. Fox said to me, he says 'anywhere Dr. Trivett wants to send you to be taken care of and be fixed up I will take care of everything.'

"Q. All right, did you return home then from that visit? A. I went back and I told Dr. Trivett just what Dr. Fox had

told me. And then I went home. And I didn't decide right away because I wanted to talk to my husband. And the next time I went down I talked to Dr. Trivett and that is when he called Dr. Maras and was talking to him about my case and that is when Dr. Trivett tried to get me in down at a Cleveland hospital on a charity case.

"Q. What month was that? A. Oh, I don't know, in April I guess.

"Q. Was it before or after Dr. Fox went on vacation? A. I think Dr. Fox was on a vacation but I—or after he come back—I am not sure. But I think it was after he come back; I had been down to visit Dr. Maras.

"Q. Did you have a talk with Dr. Trivett—How did you find out that Dr. Fox was on vacation? A. Well, at first I called up Dr. Trivett and I told him, I says, 'there is something got to be done, for me, Doctor, I can't go on like this' and I says 'right now I am a nervous wreck' and I says 'I want to know what you or Dr. Fox will do about this?' And I said 'if somebody don't do something about it I am going to law, or sue Dr. Fox,' that is what I said. And Dr. Trivett says 'no, don't go to no lawyer or anything until I have lunch today with Dr. Fox and then I will call you back.' And so I said I wouldn't go. And I waited all day, this was on Saturday, and I waited all day to hear from Dr. Trivett. And on Monday I went down to the office. Then I told Dr. Trivett, I says 'You were supposed to call me and you didn't do it' and I says 'did you have a talk with Dr. Fox?' he says 'no, Dr. Fox left for a vacation' and he says 'we can't do anything for you or you can't be operated on or anything until Dr. Fox gets back from his vacation.' "

Some unspecified time later, plaintiff went to see Dr. Fox and asked him who was going to pay the Maras bill and Dr. Fox said: "Anywhere you want to go to be fixed up, anywhere Dr. Trivett wants you to be taken care of, I will take care of everything."

Plaintiff went to the St. Alexis Hospital in Cleveland on May 24, 1957, and on May 31st was operated by Dr. Maras. She was discharged from the hospital on June 26th. The operation was successful.

Plaintiff had a further conference with Dr. Fox, the first

week in July.  Dr. Fox asked her about her condition and she told him she was all right.

Upon cards introduced as exhibits by the plaintiff in the handwriting of the defendant appears the following:

"Mrs. Annabelle Pump—31  August 25, 56
602 Fulton Street
Notes made after August 1st after semi retirement.
Practice taken over by Dr. Trivett.  Recalling things prior to August 1-56.

"Operation:  April 14, -56

"Hysterectomy, Rt. oopthorectomy, Rt. salpringectomy and appendectomy.

"See pathology report.

"On or about April 25, -56, office exam revealed fistula. Catheterized.

"4-27 inserted cather.  Bed rest.

"May 11, -56 Dr. Johnson exam at hosp.  Letter to Mrs. Pump requesting her to come to Toledo for exam.  Went to Toledo exam by Dr. Johnson, was told by Mrs. Pump to return in 6 wks.

"Aug. 25, -56, Mr. and Mrs. Pump came to office.  Informed them of retirement.  Introduced them to Dr. Trivett to render further service.

"Learned that 2nd op. was done.  2 or 3 wks after op. wanted to know about hosp. and dr. bills—referred to Hilt Ins. agency.

"Mrs. Pump informed me she never would have another op.

"Jan. 7, -57, office about bills.

"Feb. (?), -57, office about bills.

"Feb. 9, -57, office about bills.

"Vacation Fla—Feb. 13 to Aprl. 1 - 57.

"June 17, -57—wanted me to look after her after return from Cleveland Hospital—refused—on acct. of retirement. Hilt Agency.

"After returning from hosp. some time in July—hosp. and dr. bill.

"Notice of suit to be filed unless demands were met on or before June 9, -58.  Letter from attorney given to Mr. Hilt.

"July 26, -58, notice of deposition Aug. 11, -58, at office."

Upon cross-examination defendant stated that on April 27 he suspected there was trouble coming. He denied he made the notes relative to the treatment of the plaintiff and said "It was to keep tab on what or some of the things I saw developing." Defendant also admitted that some of his notes were made at the time the event recorded transpired and others at a later date.

In answer to interrogatories propounded by defendant in his answer, plaintiff stated in writing:

"At no time after August 1, 1956, did defendant personally 'treat' me either surgically or physically. However, at all times described and set forth in the petition until at least July 1, 1957, the defendant directed and caused me to be medically, surgically and physically treated by specialist physicians selected or approved by him and until my last visit to Dr. Fox's office during or after the first week in July, 1957, he was my consulting physician.

"The nature of the medical, surgical or physical treatment rendered to me by the defendant after August 1, 1956, is fully set in the petition. He did not personally give me physical or surgical treatment after August 1, 1956. He rendered me the medical treatment, the nature of which is described in the petition, through other physicians selected or directed or agreed to be paid by him."

Upon cross-examination, plaintiff also admitted that from the time she consulted Dr. Johnson in July 1956, Dr. Fox did not treat her physically or surgically, or medically, and that whatever conferences she had with Dr. Fox after July 1956, were all about the discussion of who was going to pay the bills and that was her purpose in going to see Dr. Fox.

As to a cause of action for malpractice by a physician, the statute of limitations begins to run at the latest upon the termination of the physician-patient relationship. *Delong* v. *Campbell, Exrx.*, 157 Ohio St., 22, 104 N. E. (2d), 177. Conversely, the statute of limitations does not begin to run until the contract relation is terminated. *Bowers* v. *Santee*, 99 Ohio St., 361, 124 N. E., 238, approving and following *Gillette* v. *Tucker*, 67 Ohio St., 106, 65 N. E., 865, *McArthur* v. *Bowers*, 72 Ohio St., 656, 76 N. E., 1128, disapproved. See, also, *Amstutz* v. *King*,

103 Ohio St., 674, 135 N. E., 973. In the third paragraph of the syllabus of the *Gillette case* it is stated "until the case has been so abandoned, or the professional relation otherwise terminated."

At the close of plaintiff's case the evidence tended to show that on a number of occasions the plaintiff consulted defendant regarding her post-operative difficulty. After her second unsuccessful operation by Dr. Trivett she continued to call upon the defendant. According to her testimony, defendant approved her undergoing additional surgery by Dr. Maras. The record is silent regarding any statement by the defendant that he could no longer treat her until his written notation on June 17, 1957, that upon her wanting him to look after her, after her return from Cleveland, he refused on account of his retirement.

It is unnecessary for us to determine whether, in the absence of affirmative action on the part of a physician evidencing termination of the relationship or abandonment of the case, further consultations with regard to reimbursement of subsequent expenses to be incurred by such patient for relief from an unsuccessful operation should be regarded as a continuance of the physician-patient relationship. As the case stood at the end of plaintiff's case, there was no direct evidence that the relationship had terminated prior to June 17, 1957.

Admittedly, the jury might infer from evidence of the sale of his practice, his agreement not to engage in general practice and his reference of plaintiff to Dr. Trivett for a second operation, and his apparent acquiescence, if not approval of the operation by Dr. Maras, that his professional relation toward plaintiff had terminated. But on the other hand the jury could also find that the relationship did not terminate until June 17, 1957.

It is, therefore, concluded that upon the issue as to whether the relationship of physician and patient had terminated more than one year prior to the commencement of the action the trial court, after construing the evidence most strongly in favor of the plaintiff, should have found that reasonable minds could reasonably reach different conclusions, or draw different inferences upon the issue of fact thus presented, should have denied the motion and submitted the issue to the jury under appropriate instructions.

Therefore, the judgment is reversed and the cause remanded to the Common Pleas Court for a new trial.

With regard to the cross-appeal, the judgment of reversal comprises the entire judgment including the judgment in favor of the plaintiff upon her second cause of action.

Judgment reversed and cause remanded for a new trial.

*Judgment reversed and cause remanded.*

DEEDS and SMITH, JJ., concur.